

**ORDERED in the Southern District of Florida on March 5, 2019.**

Robert A. Mark, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**

```
_____
                              )
In re                         )   CASE NO.  14-11370-RAM
                              )   CHAPTER   7
DONALD JEROME KIPNIS,         )
                              )
          Debtor.             )
_____)
                              )
BARRY E. MUKAMAL, as Chapter  )
7 Trustee of the Bankruptcy   )
Estate of DONALD JEROME       )
KIPNIS,                       )
                              )
          Plaintiff,          )
                              )
vs.                           )   ADV. NO. 17-01483-RAM
                              )
TG DEVELOPMENT I, LLC,        )
                              )
          Defendant.          )
_____)
```

**ORDER GRANTING PARTIAL SUMMARY JUDGEMENT**

In this proceeding, the Plaintiff, Barry E. Mukamal

("Trustee" or "Plaintiff"), Chapter 7 trustee of the bankruptcy

estate of Donald Jerome Kipnis ("Kipnis" or "Debtor"), seeks to recover commissions allegedly due to the Debtor from the Defendant, TG Development I, LLC ("TG" or "Defendant").  Three issues central to the claims are framed in summary judgment motions filed by the parties.  For the reasons that follow, the Court is granting partial summary judgment on two of the issues and finding that factual issues remain on the third issue.

## Undisputed Facts

TG, a construction company, engaged the Debtor to manage certain real estate projects under an employment agreement dated September 3, 2004 (the "Agreement") [DE #1, pp. 9-19].  The Debtor's compensation consisted of a fixed salary of $115,000 per year, plus a "Participation Percentage" in future profits (the "Commissions").  The Agreement defined the Commissions as 2.5% of the profits attributable to each project managed by the Debtor. Agreement, p.2 ¶ 2.(c).

In addition to his salary, the Agreement provided for the Debtor to receive monthly advances of $ 21,000  (the "Advances"). The Advances were described as loans in a separate Limited Non-Recourse Promissory Note (the "Note") executed by the Debtor on October 1, 2004 [DE #5, pp. 17-21]. Under the Note, the loans accrue interest at the federal rate.

The Agreement provides that "[t]he Loans shall be repaid by [TG] offsetting payments under the [Commissions]." Agreement, ¶ 2.(b). TG's offset right is also specifically provided for in the Note:

> The full amount of unpaid principal and accrued interest shall be repaid by TG offsetting payments under the Participation Percentage ... All amounts that shall become due and payable to Kipnis under the Participation Percentage shall first be applied as an offset against all of the outstanding principal under the Loans and the accrued interest thereon. Any remaining balance of payments due to Kipnis under the Participation Percentage after giving full effect to such offset shall be paid to Kipnis. (emphasis added)

TG advanced $504,000 to Kipnis consisting of Advances of $21,000 each month for 24 months [Declaration of Oren Shmueli, DE# 25, Ex. D].

The Agreement includes a non-compete provision that is also referenced in the Note. The non-recourse Note would have become recourse if the Debtor had breached the non-compete provision. If the Debtor had breached, he would have had the obligation to repay the outstanding principal balance of the Note plus accrued interest. Agreement, p. 2 ¶ 2.(b). In the Agreement, the parties acknowledge that the principal balance of the Note would not be treated as taxable income to the Debtor "unless and until terms of the non-compete provision. . . are satisfied." Id.

3

On October 17, 2006, the Debtor and TG executed a document amending certain provisions of the Agreement (the "Amended Agreement") [DE #1, pp. 21-23]. The Amended Agreement terminated the Debtor's employment and amended section 2(c) of the Agreement relating to the Debtor's Commissions "such that it shall be paid with respect to profits attributable to [TG] exclusively with respect to Luxuria and [Mansions] which shall be the Leadership Role Projects for purposes of your Participation Percentage." Amended Agreement, p. 1 ¶ 3. The Amended Agreement also reduced the Commissions from 2.5% to 1.25%. Id.

In 2012, the non-compete provision expired, and the Note became non-recourse. TG issued an IRS Form 1099-MISC to the Debtor, allocating to him $653,509.29 in income and including such amount as an expense in TG's own tax filing. The Debtor also included $653,509.29 in his tax filing as cancelation-of-debt income.

Although the Mansions project has generated profits, TG has not paid Commissions to either the Debtor or the Trustee. It is undisputed that as of the October 3rd hearing, one unit of the Mansions project had not been sold. Also, it is undisputed that the Luxuria project is complete and lost money.

On July 30, 2018, Plaintiff filed his Motion for Summary Judgement (the "MSJ") [DE #19]. On August 31, 2018, Defendant filed its Response and Incorporated Memorandum of Law in Opposition

to Trustee's Motion for Partial Summary Judgement (the "Cross MSJ") [DE# 25], which the Court is treating as a cross motion for summary judgment.  The Court conducted a hearing on the MSJ and Cross MSJ on October 3, 2018.

### Issues Raised in The Summary Judgment Motions

There are three issues raised in the MSJ and the Cross-MSJ: (i) whether the Mansions project is "complete" under the terms of the Agreement; (ii) whether the Commissions due to the Debtor should be determined on an individual project basis or whether the Mansions and Luxuria projects should be aggregated, with Luxuria losses offsetting Mansions' profits; and (iii) whether TG may offset the Advances under the Note against the Commissions that are otherwise due or will be due under the Agreement and the Amended Agreement.

The Trustee argues that (i) the Mansions project is complete and the Commissions are due; (ii) the Commission on profits on the Mansions project cannot be offset by losses on the Luxuria project; and (iii) TG may not offset payments made to the Debtor under the Note against Commissions that are due because TG wrote-off the Note in its 2012 tax filing.

The Defendant contends that (i) the Mansions project is not complete because there is still one unit to be sold and TG may still incur other contingent liabilities; (ii) the Commissions

5

should be determined based on the net profits of both projects together; and (iii) the Form 1099-MISC did not discharge the Debtor's obligations under the Note and did not alter the unambiguous terms of the Agreement entitling TG to offset the Advances against the Commissions.

The Court has reviewed the record, including the MSJ, the Cross-MSJ, Plaintiff's Reply [DE #26], and the critical documents, including the Agreement, the Amended Agreement, and the Note. The Court has also considered the arguments of counsel presented at the October 3, 2018, hearing and reviewed applicable law. For the reasons discussed below, the Court is denying the MSJ and Cross MSJ on the completion issue, granting the Trustee partial summary judgement on separately calculating profits on Mansions without setting off losses on Luxuria, and granting TG partial summary judgement on its right to offset Advances under the Note against Commissions. The Court reserves ruling on whether the offset may include interest that accrued under the Note after TG issued the Form 1099-MISC.

## Discussion

A party is entitled to summary judgment if there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. There is a genuine issue of fact when there is enough evidence for a reasonable jury to find

6

in favor of the nonmoving party. If the fact "might affect the outcome of the suit under the governing law," it is a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Avenue CLO Fund, Ltd. v. Bank of America, N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013).

The movant has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *In re Tousa, Inc.*, 503 B.R. 499, 502 (Bankr. S.D. Fla. 2014). In assessing whether the movant met its burden, a court should view the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor. *Blackston v. Shook & Fletcher Insolation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985).

## I.   Whether the Mansions Project is Complete Remains a Factual Issue in Dispute

Under the Agreement, TG must pay the Debtor a commission based on the "net cash flows" of a project when the project is complete. Agreement, ¶ 2.(c). The Trustee argues that the Mansions project is complete because the construction is finished. MSJ, p. 10.  In support of his argument, the Plaintiff also cites Florida condominium law equating "completion of a building" with issuance of a certificate of occupancy. Id., citing § 718.203 of Florida's

Condominium Act. According to TG's Executive Vice President, such a certificate was issued and the "construction of Mansions […] is complete." Lieb Transcript at 19:19-21 [DE #19, p. 40].

TG argues that the completion of the Mansions project should not be measured by the completion of the building itself, but rather should occur only after (i) all units have been sold, (ii) "winds and sliding doors" upgrade is completed, and (iii) TG's potential liability to the condominium association under Chapter 558 of the Florida Statutes is fixed.  Cross-MSJ [DE #25, p. 7]. In support of its position, TG argues that it "has neither incurred all expenses with respect to the [Mansions] Project nor received all sales proceeds and thus it is impossible to calculate final net cash flows or ascertain the final profitability of the project." Id. at 7. As of the October 3rd hearing, one unit remained unsold.

The Trustee counters that the Mansions project is complete because "TG has turned the control of the board of the condo association to its residents" and that "TG began upstreaming excess cash to its affiliates." [DE #19, pp. 5-6]. Although the Defendant concedes that the conditions for transfer of control of the condominium association's board to its residents have been met, the Defendant argued at the hearing that there is on-going work in

8

connection with the turnover and that TG may incur additional expenses after the association completes an inspection.

The Court finds that there is a genuine issue of material fact regarding whether the Mansions project is complete for purposes of triggering the Debtor's entitlement to a Commission. The Agreement does not define or otherwise describe what is meant by "completion" of the projects, nor does the Agreement incorporate by reference the definitions set forth in the Florida Condominium Act. The Court's preliminary view is that "completion" did not occur upon the issuance of a certificate of occupancy for the building but did occur or will occur once it is clear that profits have been realized even if one unit remains unsold. In any event, the date of completion remains a disputed factual issue. Therefore, the Court will deny the Plaintiff's MSJ and the Defendant's Cross-MSJ on this issue.

**II.  The Agreement, as Amended, Provides for a Commission on the Mansions Project Without Reduction Based on Losses on the Luxuria Project**

The parties agree that the Mansions project is profitable and the Luxuria project suffered losses. The issue is whether TG may offset losses on Luxuria against profits on Mansions in calculating the Commissions. The Court finds as a matter of law that the Debtor's commission must be calculated based on the profits on the Mansions project alone.

9

The plain and unambiguous terms of the Agreement require consideration of the projects on an individual basis. Specifically, paragraph 2(c) of the Agreement entitles the Debtor to "2.5% of the profits attributable . . . to each Leadership Role Project . . . which amount shall be calculated based on the net cash flows upon completion of such project." (emphasis added).

The Court rejects TG's argument that the Amended Agreement requires the Commissions to be calculated by consolidating profits and losses on the two projects. TG cites to paragraph 3 of the Amended Agreement which states that "[the participation percentage] shall be paid with respect to profits attributable to us exclusively with respect to Luxuria and [Mansions]." (emphasis added).

Use of the word "and" in the above-quoted sentence does not modify the original Agreement which, as described above, provides for separate calculations for each project. The sentence in the Amendment simply limits the projects to which the compensation scheme applies. It has no bearing on whether the net cash flow of the projects should be calculated individually or jointly.

In sum, there is no genuine issue of material fact and the Plaintiff is entitled to partial summary judgment as a matter of law finding that the parties agreed to calculate net cash flows on a per-project basis. Therefore, the Commissions will be calculated

based on the profits of the Mansions project, without reduction based on losses in the Luxuria project.

## III. The Tax Form TG Issued in 2012 Did not Extinguish its Setoff Rights Under the Agreement

The Agreement provided that the monthly Advances that were treated as loans under the Note would not be taxable as income to Kipnis until the non-compete provisions in the Agreement were satisfied.  Agreement ¶ 2.(b).  By implication, this meant that Kipnis would have to recognize the Advances as income once the non-compete provisions were satisfied, which they were in 2012. At that point, the loan Advances became non-recourse.

In 2012, TG issued an IRS Form 1099-MISC to the Debtor, allocating $653,509.29 in income to him.  TG included that amount as an expense in its tax filing, and Kipnis treated that amount as cancellation of debt income in his 2012 return.

The Trustee argues that by issuing the Form 1099-MISC, TG cancelled the debt under the Note, also terminating TG's right to offset the Commission due against the Advances made under the Note. The Court rejects the Trustee's argument.  First, IRS Form 1099-MISC is not the appropriate form to report a cancellation of debt. *Sigurdsson v. Dicarlantonio*, Case No: 6:12-cv-920-Orl-TBS, 2013 WL 12121866, *8 (M.D. Fla. Dec. 11, 2013) ("A cancelled debt is not

reportable on a Form 1099-MISC." (quoting the IRS instructions for form 1099-MISC)).

Second, even if the Form 1099-MISC could be treated as a Form 1099-C for purposes of cancelling a debt, the Court concludes as a matter of law that issuance of the tax form did not extinguish TG's offset rights under the Note and the Agreement.

The cases cited by the Trustee do not support his argument to extinguish TG's offset rights. At best, these cases address a creditor's right to collect a debt. *See In re Lukaszka*, Bankruptcy No. 17-00242, 2017 WL 3381815 (Bankr. N.D. Iowa Aug. 4, 2017) (whether a mortgagee has an enforceable mortgage securing a debt for which it issued a 1099-C to the debtors). TG concedes that it has no right to affirmatively recover the Advances. That much was clear under the Agreement and Note when the non-compete provisions were satisfied and the Note became non-recourse.

The issue is whether by issuing the Form 1099-MISC for tax purposes in 2012, TG terminated its right to offset the loan Advances against its Commission obligations. The Court finds no legal, equitable, or logical basis to reach that conclusion.

The Court claims no specialized tax expertise and offers no opinion on whether the Agreement and Note were structured for tax purposes to allow Kipnis to defer recognizing income on the Advances, or whether the recourse contingency was a material

12

business term providing significant financial consequences if Kipnis failed to comply with his non-compete obligations. Perhaps it was both.

What is clear is that TG issued the Form 1099-MISC when the Advances had to be treated as income by Kipnis and could then be treated as expenses by TG. There is absolutely no indication that issuance of the tax form was intended to affect the offset obligations under the Agreement. To do so would be to disregard a fundamental business term of the Agreement and provide an undeserved windfall to the Trustee.

The deal was straightforward and clear. Kipnis received the Advances against the Commissions that would be earned if either project was successful. The Advances were treated as loans and were repayable by Kipnis independent of his right to receive commissions if, and only if, he breached his non-compete obligations. Once these obligations were satisfied, the Advances were no longer collectible as loans, but they remained amounts that would offset his right to future Commissions.

In sum, TG's issuance of a Form 1099-MISC in 2012 did not nullify TG's right to offset the Advances under the Note against any future Commission obligations to Kipnis. The only open issue is whether TG had the right to continue to accrue interest on the

advances after the loan became non-recourse and it issued the Form 1099-MISC.

Based upon the undisputed material facts and the Court's legal conclusions of law described above, it is –

**ORDERED** as follows:

1.   The MSG is granted in part and denied in part.

2.   The MSJ is granted on the issue of whether profits on the Mansions project may be offset by losses on the Luxuria project.  The Court finds that the Agreement and Amended Agreement are unambiguous and provide for TG to pay Commissions on the Mansions project calculated without reduction based on losses on the Luxuria project.

3.   The MSJ is denied on the "completion" issue.  Whether the Mansions project is "complete" remains a disputed factual issue.

4.   The MSJ is denied to the extent it sought a finding that by issuing a Form 1099-MISC in 2012, TG extinguished its right to offset the Advances against its Commission obligations.

5.   TG's Cross MSJ is granted in part and denied in part consistent with the findings and conclusions on the Trustee's MSJ.

### 

14

COPIES FURNISHED TO:

David L. Rosendorf, Esq.
KOZYAK TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Blvd. – 9th Floor
Coral Gables, FL  33134
(Counsel for Plaintiff)

Jeffrey I. Snyder, Esq.
BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
1450 Brickell Avenue – Suite 2300
Miami, FL  33131-3456
(Counsel for Defendant)